**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

Mark A. Aldrich,

               Plaintiff,

v.

The City of Columbus, et al.,

               Defendants.

Case No. 2:15-cv-404

Judge Graham

Magistrate Judge Kemp

**<u>OPINION & ORDER</u>**

This matter is before the Court on Defendants' motion for summary judgment. (Doc. 16). Defendants are the City of Columbus and one of its police officers, Kevin Singleton. In the main, Plaintiff Mark Aldrich claims that Officer Singleton used excessive force against him when Officer Singleton took him to the ground using an arm-bar takedown technique while Aldrich was only passively refusing Officer Singleton's commands. Aldrich brings a claim for excessive force under 42 U.S.C. § 1983 and a claim for battery under Ohio law. Aldrich also brings a claim against the City of Columbus for failure to train its officers. Officer Singleton argues he is entitled to qualified immunity because his use of force was reasonable under the circumstances. Furthermore, if Officer Singleton is entitled to qualified immunity, then the City of Columbus cannot be liable on Aldrich's claim that the city failed to train its officers.

**I.      Background**

There is a video of the incident. Columbus Police Department ("CPD") Officer Chance Knox arrived at 1440 West Rich Street and reported over the radio that he had a stolen vehicle with two male suspects nearby. He requested back up. Officer Knox exited his cruiser and detained one of the men near the van. The second CPD car to arrive on the scene contained Officer Singleton and his partner, Officer Andrew Starner. Officer Starner went to inspect the reportedly stolen van; Officer Singleton approached the other suspect, Mark Aldrich.

Aldrich stood near the rear passenger side of the van and leaned against the hood of another vehicle. He was smoking a cigarette and drinking a beer. Officer Singleton approached Aldrich, telling him to put the cigarette down and come with him. Officer Singleton repeated the command, but Aldrich refused to comply. Aldrich reports a slightly different command—that Officer Singleton ordered him to get on the ground. Officer Singleton says that Aldrich responded to his command by saying "I don't fucking think so." Aldrich says that he only asked, "for what?" After this eight to nine second exchange, Officer Singleton moved towards Aldrich. Taking the few steps towards Aldrich, Officer Singleton grabbed Aldrich and knocked his cigarette away, either from his hand or his mouth.[1] (*Compare* Answer at ¶ 22 (knocked from Plaintiff); *with* Singleton Dep. at 26 (possibly knocked out of his hand)). Regardless of precisely where the cigarette came from, the video depicts it flying away from the two men. Officer Singleton then put his other hand on Aldrich's upper back and took him to the ground.

At this stage, it's useful to highlight where the parties' versions of events differ.

Aldrich claims that in a few seconds, Officer Singleton approached him, commanded him to get on the ground, Aldrich asked him "for what?", Officer Singleton smacked his cigarette away, grabbed his arm behind his back, and with his other hand forced him face-first into the ground.

Officer Singleton claims that he commanded Aldrich several times to put his cigarette down and come with him. Officer Singleton recalls Aldrich refusing his commands with profanity: "I think he said, 'I don't fucking think so.'" (Singleton Dep. at 19:6–7). After this, Officer Singleton stepped towards Aldrich and attempted to put him in the escort position—a position where the officer grabs the subject's arm above the elbow and at the wrist. Officer Singleton cites this as a Level One use of force. In his After Action Report, Officer Singleton reported he attempted to place him in the escort position to take him to the cruiser, but Aldrich then "attempted to jerk away from me." (Singleton Dep. Ex. A, Doc. 16-4 at 14). The video shows Aldrich made no attempt to jerk away from Officer Singleton; if he did so, it was a movement imperceptible to the admittedly low-resolution camera. Officer Singleton slightly revised his statement from the After Action Report, saying in his deposition that when he grabbed Aldrich, he

---

[1] Aldrich argues that Officer Singleton "punch[ed] the cigarette out of Mr. Aldrich's mouth." (Pl.'s Resp. at 6, Doc. 18). For proof, Aldrich cites Defendants' Answer, in which they admit only that Officer Singleton "knocked the cigarette from Plaintiff." (Answer at ¶ 22, Doc. 3). This isn't the admission Aldrich says it is, and it's consistent with Defendants' argument that Officer Singleton knocked the cigarette from Aldrich's hand.

"immediately tensed up and I felt like he was trying to jerk away." (Singleton Dep. at 26). Officer Singleton felt Aldrich's muscles tense up, which signaled to him that Aldrich might be going to jerk away from him. Officer Singleton testified that in his experience, when you put someone in the escort position, they sometimes tense up, but he didn't think it happened frequently. He further testified that starting in this position, it's easiest to transition to an arm-bar takedown, and he could think of no other position he might transition to.

Aldrich suffered a cut to his face that medical technicians examined at the scene. He was told he should get stitches, but was not taken to a hospital. Aldrich had a swollen eye the next morning and said he was "sore as all get out." (Aldrich Dep. at 55). Aldrich was unable to work as a "self-employed mechanic" as he recuperated for the next few days. Aldrich ultimately consulted a chiropractor to treat his injuries, and he is now in the process of applying for Social Security Disability benefits.

## II. Legal Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

> Courts consider the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. The ultimate question is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'

*Quigley v. Tuong Vinh Thai*, 707 F.3d 675, 679 (6th Cir. 2013) (internal citation omitted) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986)). So while the Court draws all reasonable inferences in favor of the non-moving party, testimony that contradicts an unambiguous video recording does not create a triable issue of fact. *Shreve v. Franklin Cty.*, 743 F.3d 126, 132 (6th Cir. 2014). Under either of the two prongs of the qualified-immunity analysis, "courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Tolan v. Cotton*, 134 S. Ct. 1861, 1866, 188 L. Ed. 2d 895 (2014).

### III.  Discussion

### A.  Qualified Immunity

"A defendant enjoys qualified immunity on summary judgment unless the facts alleged and the evidence produced, when viewed in the light most favorable to the plaintiff, would permit a reasonable juror to find that: (1) the defendant violated a constitutional right; and (2) the right was clearly established." *Morrison v. Bd. of Trs. of Green Twp.*, 583 F.3d 394, 400 (6th Cir. 2009). But "the first step in the qualified immunity analysis require[s] the court to determine the relevant facts." *Chappell v. City Of Cleveland*, 585 F.3d 901, 909 (6th Cir. 2009). When the plaintiff's and the defendants' versions of events differ, "courts are required to view the facts and draw reasonable inferences in the light most favorable to the party opposing the [summary judgment] motion. In qualified immunity cases, this usually means adopting . . . the plaintiff's version of the facts." *Scott v. Harris*, 550 U.S. 372, 378 (2007) (internal citations and quotation marks omitted). The Court is not required to credit the plaintiff's version of the facts to the extent it's contradicted by unambiguous video evidence. *See id.* at 380–81.

Here, a grainy video depicts the entire interaction between Aldrich and Officer Singleton. It does not, however, contain audio. The video depicts the following:

11:20:50 PM[2] – Officer Singleton first appears, walking towards Aldrich who is learning against a vehicle facing the stolen van.

11:20:57 PM – Officer Singleton stops in front of Aldrich, shining his flashlight on Aldrich, including shining it towards Aldrich's empty right hand. Aldrich raises his cigarette to his mouth.

11:20:57 PM – 11:21:05 PM – Officer Singleton appears to be speaking to Aldrich; Aldrich, unmoved, continues to lean against the front of a vehicle and smoke his cigarette.

11:21:05 PM – Officer Singleton moves towards Aldrich rapidly.

11:21:06–07 PM – Officer Singleton grabs Aldrich by the left arm and with his other hand smacks Aldrich's cigarette away.

11:21:08–09 PM – Officer Singleton places his free hand on the back of Aldrich's neck or shoulders and drives him into the ground, executing the arm-bar takedown.

---

[2] The video bears these timestamps, but Defendants argue that the clock is one hour off. (Defs.' Reply at 3 n.1, Doc. 22).

Officer Singleton spent eight to nine seconds standing in front of Aldrich. At no time did Aldrich make any move towards or away from Officer Singleton.

But the video doesn't tell the whole story. It doesn't contain audio, and it can't show the muscle tensing that Officer Singleton says led to him executing the takedown. Aldrich and Officer Singleton agree they had some verbal exchange, but their accounts diverge on some of the specifics. Officer Singleton says that Aldrich tensed up when he hit a cigarette out of his hand and grabbed his arm; Aldrich doesn't remember what happened, saying he only remembers that after he asked Officer Singleton, "for what?", "the next thing I know, I'm in the back of the cruiser and I come to consciousness, but honestly I don't remember anything but hitting the ground and then being put into the back of the cruiser." (Aldrich Dep. at 32:6–12).

To summarize, within eight seconds, Officer Singleton asked Aldrich to get on the ground, Aldrich said, "for what?", Officer Singleton attempted to put him in the escort position, and then he took him to the ground face first. The parties differ on some facts that the video can't provide; the Court has to view those facts in the light most favorable to Aldrich. With the facts in order but with some in dispute, the Court moves to the qualified immunity analysis.

Qualified immunity requires a two-step analysis[3]: "we ask two questions: (1) whether the officer violated the plaintiff's constitutional rights under the Fourth Amendment; and (2) whether that constitutional right was clearly established at the time of the incident." *Kent v. Oakland Cty.*, 810 F.3d 384, 390 (6th Cir. 2016). The Court "may conduct this analysis in any order." *Id.*

### 1. Did the officer violate the plaintiff's constitutional rights under the Fourth Amendment?

Whether an officer's use of force in effecting an arrest violates the Fourth Amendment turns on "whether the officer['s] actions are 'objectively reasonable' in light of the facts and circumstances confronting [him], without regard to [his] underlying intent or motivation." *Graham v. Connor*, 490 U.S. 386, 397, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). In this analysis, we pay "careful attention to the facts and circumstances of ... [the] case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest

---

[3] Sometimes, the Sixth Circuit uses a three-step analysis. *Quigley*, 707 F.3d at 680 n.2. "The third step is 'whether the plaintiff offered sufficient evidence to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights.'" *Estate of Carter v. City of Detroit*, 408 F.3d 305, 310–11 (6th Cir. 2005) (quoting *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 905 (6th Cir. 2004) (internal quotation omitted)).

by flight." *Id.* at 396, 109 S.Ct. 1865 (citations omitted). The ultimate question, however, is " 'whether the totality of the circumstances justifies a particular sort of seizure.' " *St. John v. Hickey*, 411 F.3d 762, 768 (6th Cir. 2005) (quoting *Tennessee v. Garner*, 471 U.S. 1, 8–9, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985)). Throughout the inquiry, we must carefully balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396, 109 S.Ct. 1865. We are to consider " 'reasonableness at the moment' of the use of force, as 'judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight,' " *Goodwin*, 781 F.3d at 321 (quoting *Graham*, 490 U.S. at 396, 109 S.Ct. 1865), and we must take into account the fact that police officers "are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97, 109 S.Ct. 1865.

*Id.* The Court uses the three *Graham* factors to guide its analysis.

### i.    Severity of the crime

Defendants remind the Court that the officers were investigating a car theft that was a felony. That's true. Dovetailing with the second *Graham* factor, courts assess the severity of the crime because it could change a reasonable officer's perspective on the amount of force necessary to detain a suspect. Specifically, a crime that "carries no connotation of violence" justifies a lower amount of force. *See Shreve v. Jessamine Cty. Fiscal Court*, 453 F.3d 681, 687 (6th Cir. 2006) (no officer safety component implicated by arrestee's alleged crime); *see also Thacker v. Lawrence Cty.*, 182 F. App'x 464, 472 (6th Cir. 2006) ("The crime of disorderly conduct is not a violent or serious crime, and this fact weighs in favor of using less force in arresting [the plaintiff].").

Here, when Officer Singleton approached Aldrich, he suspected him of felony theft of a motor vehicle. The Ohio Revised Code makes grand theft of a motor vehicle a felony of the fourth degree. Ohio Rev. Code § 2913.02(B)(5). This crime is more severe than the disorderly conduct in *Thacker* and the bail-jumping charge in *Shreve*. But even felony motor vehicle theft does not carry any connotation of violence. So while Aldrich's suspected crime was a felony, the first *Graham* factor weighs in favor of less force.

### ii.    Whether the suspect posed an immediate threat to the safety of the officers or others

Aldrich posed almost no threat to anyone. He was leaning against a truck with a cigarette in one hand and nothing in his other hand. He never moved towards or away from Officer Sin-

gleton as he approached. He made no threats or threatening gestures towards Officer Singleton. He did not brandish any weapons, nor did he change his posture in a way to indicate he would fight or flee. In short, Aldrich cut a relaxed figure leaning against the hood of a truck.

Officer Singleton makes two points about the threats Aldrich posed: one about a specific, known threat and the other about general, unknown threats. The known threat was a lit cigarette in Aldrich's hand. This first point is almost irrelevant. Aldrich alleges that Officer Singleton used excessive force with the arm-bar takedown. This occurred after Officer Singleton had already disabused Aldrich of his lit cigarette, so the cigarette no longer posed any threat. To be sure, a reasonable officer would want to ensure his own safety by removing an arrestee's lit cigarette before moving them to the cruiser. *Jones v. Montgomery*, No. 15-1142, 2016 WL 5947347, at *6 (W.D. Tenn. Oct. 13, 2016) ("[A] reasonable officer in Montgomery's position would not know that slapping a cigarette out of an arrestee's hand prior to handcuffing constituted excessive force."). But this isn't the issue here—Officer Singleton did this, and then, after the cigarette was no longer a threat, executed the arm-bar takedown.

The Court is sympathetic to Officer Singleton's second point: police officers encounter rapidly evolving situations often with very little information. Officer Singleton argues that Aldrich could have reached for something from his pocket or from behind him in the truck. In these situations, officers don't know whether a suspect has a weapon, seeks to do them or others harm, or intends to flee. But the Court is tasked with judging Officer Singleton's reaction given the information he had available to him at the time and say whether a reasonable officer would have done what he did. And while the possibility that a suspect would become violent would be in the mind of any reasonable officer, in this situation, Officer Singleton saw that Aldrich had a cigarette in his left hand and nothing in his other hand. Officer Singleton saw Aldrich make no move towards him, make no threats, make no attempt to flee, make no attempt to grab anything, and make no attempt to assume a more aggressive or flight-ready posture.

In cases where an officer had ahold of a suspect who was compliant, not fleeing, and posed no threat with his hands exposed, performing a takedown may be excessive force. *See McCaig v. Raber*, 515 F. App'x 551, 556 (6th Cir. 2013) ("[A] reasonable jury could find that McCaig posed little or no threat based on the facts alleged."). Admittedly, Aldrich was not vocally compliant like the plaintiff in *McCaig*, but the difference in the two cases is slight. Furthermore, Officer Singleton moved on Aldrich quickly, with no indication that he would fight or flee.

This factor weighs in favor of less force because Aldrich posed little threat at any time during the encounter.

### iii. Whether suspect is actively resisting arrest or attempting to evade arrest by flight

Aldrich's resistance was minimal and he made no attempt to evade arrest. But Defendants posit two arguments to show that the amount of force used was not excessive. First, that Aldrich's passive resistance was enough to merit the amount of force used. Second, that Aldrich actively resisted by "tensing up" as Officer Singleton grabbed him, justifying the arm-bar takedown. Neither is persuasive.

Aldrich at least passively resisted: he said he responded to Officer Singleton's command to get on the ground by asking, "for what?" He did not comply with Officer Singleton's commands. If the Court credits Aldrich's version of events, he doesn't recall whether he "mouthed off" to Officer Singleton. Officer Singleton argues that Aldrich admits that he told the officer, "I don't fucking think so," in response to the officer's command to get on the ground. But this comes from Aldrich's speculation about his general demeanor in that type of situation, not from any specific recollection of the event. Here's the quote from Aldrich's deposition:

> Q[uestion]. It says here: Plaintiff then made an oral response to Officer Singleton likely mouthing off to him that he did not feel he had an obligation to come with Officer Singleton. Do you -- as you sit here today, do you recall that?
> A[nswer]. No. But with me, I probably would have an attitude if I'm on my own property and I haven't done nothing.

(Aldrich Dep. at 35:23–36:7). The Court cannot adopt Aldrich's speculation, particularly when construing the facts in the light most favorable to him. The Court must consider the video plus Aldrich's recollection. This version of the facts shows that Aldrich at least did not immediately—within eight to nine seconds—comply with Officer Singleton's command to get on the ground, but that Aldrich only questioned the command. This is passive resistance.

"[T]he right of a suspect to be free from the use of physical force when he is not resisting police efforts to apprehend him" is a clearly established right. *Eldridge v. City of Warren*, 533 F. App'x 529, 535 (6th Cir. 2013) (plaintiff "played no role in escalating the aggression."). But "the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham v. Connor*, 490 U.S. 386, 396 (1989). A simple refusal by an unthreatening suspect to comply with an officer's commands does

not warrant the use of significant force. *See Griffith v. Coburn*, 473 F.3d 650, 659 (6th Cir. 2007) (excessive force where officer choked to death a suspect who ignored officer commands and protested that the police had the wrong individual); *see also McCaig v. Raber*, 515 F. App'x 551, 555 (6th Cir. 2013) (takedown was excessive force where arrestee made no aggressive gestures or statements, attempted to cooperate, offered no resistance, and stated "I'll go easily."); *Meirthew v. Amore*, 417 F. App'x 494, 499 (6th Cir. 2011) (passive resistance in a police booking room while handcuffed did not justify takedown); *Baker v. City of Hamilton*, 471 F.3d 601, 607 (6th Cir. 2006) (suspect surrendering to officer with hands up presented no significant threat; therefore, hits with nightstick were unreasonable); *Lustig v. Mondeau*, 211 F. App'x 364, 370 (6th Cir. 2006) (passive resistance and yelling while detained did not justify arm twisting and jerking that caused injury). "[N]oncompliance alone does not indicate active resistance; there must be something more. It can be a verbal showing of hostility, . . . [or] a deliberate act of defiance using one's own body, . . . or some other mechanism . . . ." *Eldridge*, 533 F. App'x at 535 (internal citations omitted).

Here, by the point that Officer Singleton approached Aldrich, Aldrich enjoyed the right to be free from any physical force above the slight degree that it would take to escort him to the cruiser. At this point, Officer Singleton could reasonably have used the force necessary to remove Aldrich's cigarette and put him in the escort position. Aldrich's passive resistance does not itself justify the arm-bar takedown. With nothing more, a reasonable jury could find that the takedown was objectively unreasonable.

And this is the nub of the case: the arm-bar takedown. Officer Singleton alleges that Aldrich tensed up like he was going to jerk away when Officer Singleton put his hands on him to put him in the escort position. It was Aldrich's "tensing up" that justified, in Officer Singleton's mind, the escalation of force from the arm-bar escort position to the arm-bar takedown. Originally, Officer Singleton said that Aldrich "jerked away," and if Aldrich had done so, Officer Singleton's take down would be permitted as an attempt to restrain a fleeing suspect. But the video tells a different story—the video shows that the only movements Aldrich made were those that a reasonable jury could believe were caused by Officer Singleton's application of force. Maybe Officer Singleton did feel Aldrich flinch in a way that indicated he would flee, but that's not apparent from the video.

But even if Aldrich did tense up when Officer Singleton grabbed him, this cannot lead to an automatic escalation of force to a face-first arm-bar takedown. It would be the odd case indeed if a person did not tense up when an officer smacked a cigarette out of their hand and quickly grabbed their arm, forcing it into an uncomfortable position. *See McCaig v. Raber*, No. 1:10-CV-1298, 2012 WL 1032699, at *3 (W.D. Mich. Mar. 27, 2012), *aff'd*, 515 F. App'x 551 (6th Cir. 2013) ("There is a question of fact as to whether an officer in Defendant's position would have reasonably perceived Plaintiff's action as resistance as opposed to a natural reaction to a sudden loud noise."). Here's the problem: if the Court adopts Officer Singleton's position—that a suspect's "tensing up" after being unexpectedly grabbed justified an arm-bar takedown—any officer could induce an involuntary reaction that in turn would justify the officer's use of increased force. This cannot be the rule. The Court finds that a reasonable jury could find that Officer Singleton's actions were unreasonable, and there exist a genuine dispute of material fact on this issue.

None of this is to say that law-enforcement officials cannot use the arm-bar takedown technique on passively resisting suspects. *See Bozung v. Rawson*, 439 F. App'x 513, 520 (6th Cir. 2011) (affirming grant of qualified immunity to officer who used arm-bar takedown on passively resisting suspect when suspect did not comply with officer's orders—repeated for two to three minutes—to put his hands behind his back). But *Bozung* does not make an arm-bar takedown maneuver appropriate in every arrest. *See McCaig v. Raber*, No. 1:10-CV-1298, 2012 WL 1032699, at *3 (W.D. Mich. Mar. 27, 2012), *aff'd*, 515 F. App'x 551 (6th Cir. 2013). As always, the question is whether the totality of the circumstances justifies the use of an arm-bar takedown.

Here, the totality of the circumstances dictated the use of a lesser degree of force than Officer Singleton used. The peak of Aldrich's resistance was asking Officer Singleton, "for what?" The only concrete threat Officer Singleton perceived was Aldrich's cigarette, which he removed from Aldrich easily. And the possibility of other, unknown threats was minimized by Aldrich's posture and hand position, especially since Officer Singleton had seen both of his hands. And since the video contradicts Officer Singleton's statement that Aldrich "jerked away," and the video shows Aldrich made no effort to move away from Officer Singleton, the Court cannot say that any of the factors to weigh in favor of the force used by Officer Singleton.

In short, the Court finds that a reasonable jury could find Officer Singleton's arm-bar takedown to be objectively unreasonable. In any event, the credibility of Officer Singleton's ac-

count is not for the Court to decide, but is the province of the jury. *Adams v. Metiva*, 31 F.3d 375, 387 (6th Cir. 1994).

## 2. Was the constitutional right clearly established at the time of the incident?

"In order for a constitutional right to be clearly established, there need not be a case with the exact same fact pattern, or even 'fundamentally similar' or 'materially similar' facts; rather, the question is whether the defendants had 'fair warning' that their actions were unconstitutional." *Cummings v. City of Akron*, 418 F.3d 676, 687 (6th Cir. 2005) (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)). "When analyzing whether a constitutional right was clearly established at the time of the events in question we 'must look first to decisions of the Supreme Court, then to decisions of this Court and other courts within our circuit, and finally to decisions of other circuits.'" *Merriweather v. Zamora*, 569 F.3d 307, 315 (6th Cir. 2009) (quoting *Buckner v. Kilgore*, 36 F.3d 536, 539 (6th Cir. 1994) (citation omitted)). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001).

Generically, "both the right to be free from unreasonable seizures and to be free from the use of excessive force under the Fourth Amendment are clearly established." *Adams*, 31 F.3d t 386 (internal citations omitted). More specifically, the use of a takedown on an unrestrained, non-fleeing, non-violent suspect has been held, in materially similar circumstances, to be objectively unreasonable. *See McCaig v. Raber*, 515 F. App'x 551, 553 (6th Cir. February 21, 2013). In *McCaig*, the officer bear hugged the suspect and "while lifting him up and executing a leg sweep, 'slamm[ed]' [the plaintiff] to the ground back-first." *Id.* The plaintiff in *McCaig* was slammed with such force that he broke his wrist. *Id.* Admittedly, the force in *McCaig* was more force than in this case. But in this case, the arm-bar takedown led to the plaintiff going face first into the ground rather than back-first. Another distinction is that the plaintiff in *McCaig* said he would "I'll go easily." *Id.* Aldrich never offered compliance; when commanded to the ground, he said "for what?" But in both cases, the trigger that caused the officer to escalate his use of force was a tensing up or jerking away that was at least arguably caused by the officers themselves and could easily be construed as a natural, involuntary reaction and not an attempt to flee. *Id.* *McCaig* is a materially similar case that gave Officer Singleton fair warning.

Other similar cases involved a higher degree of force than the arm-bar takedown used here, but nearly all those cases involved more resistance, either passively of not. The only case that involved arguably less force is *Lustig*, where a police officer repeatedly raised a handcuffed suspect's hands high behind her body, which caused serious pain and possibly permanent injury. 211 F. App'x at 371. While the "arm-bar takedown" may be low on the CPD force continuum, it could actually generate significant injury, particularly if an arrestee is unable to brace themselves with a free hand as they fall face first into the ground with an officer on their back. That appeared to be the case here, and Aldrich suffered cuts to his head as a result. The arm-bar takedown here was a significant use of force. "Because it was clearly established that the use of significant force in response to passive resistance may constitute excessive force, and because Plaintiff posed no safety threat to Defendant [Singleton] or to others, [Singleton] is not entitled to summary judgment based upon qualified immunity." *Byrne v. Bero*, No. CIV. 13-15118, 2015 WL 3476956, at *8 (E.D. Mich. June 2, 2015) (holding that pre-2013 caselaw clearly established that an arm-bar takedown was excessive force on a suspect who failed to immediately obey an officer's commands and asked "why am I being arrested?").

Officer Singleton's motion for summary judgment on the basis of qualified immunity is denied.

### B. State law claim

Aldrich's state law claims are time-barred by the statute of limitations. Aldrich stated a claim for battery. (Compl. at ¶¶ 78–79). Under Ohio law, an action for battery must be brought within one year after the incident. Ohio Rev. Code § 2305.111(B). The incident occurred on April 23, 2013. The statute of limitations ran on April 23, 2014. Aldrich filed his complaint on January 29, 2015. Therefore, Aldrich's state law battery claim is time-barred. Aldrich makes no attempt to argue this point.

### C. Municipal liability

Aldrich alleges that the "City of Columbus was deliberately indifferent in the training, adoption and dissemination of policies, supervision, and discipline of its officers." (Compl. at ¶ 70, 73). Specifically, Aldrich alleges that the City didn't train its officers adequately in two areas. One: on the "use of excessive force in situations where its officers got caught up in the excitement of the moment, believed they had been treated disrespectfully, wanted to capture the

subject's full attention and cooperation during an investigation, and viewed the subject as a repeat offender or lower-class member of society who needed to be taught a lesson." (*Id.* at ¶ 69). Two: on the "fabrication of inculpatory facts in their police reports and/or omission of material exculpatory facts in order to overcharge and entice suspects to enter plea bargains and execute a release or waiver of any claims for excessive force . . . ." (*Id.* at ¶ 72).

Municipalities are generally not vicariously liable under § 1983 for the actions of their employees. *D'Ambrosio v. Marino*, 747 F.3d 378, 386 (6th Cir. 2014). A municipality is only liable under § 1983 "if the challenged conduct occurs pursuant to a municipality's 'official policy,' such that the municipality's promulgation or adoption of the policy can be said to have "cause[d]" one of its employees to violate the plaintiff's constitutional rights." *Id.* at 386 (citing *Monell v. Dep't of Soc. Servs. of N.Y.C.*, 436 U.S. 658, 692 (1978)).

> A plaintiff can make a showing of an illegal policy or custom by demonstrating one of the following: (1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations.

*Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013). To succeed on a failure-to-train claim, Aldrich needs to show that the City of Columbus's failure to train demonstrates a "'deliberate indifference' to the rights of its inhabitants." *Shamaeizadeh v. Cunigan*, 338 F.3d 535, 557 (6th Cir. 2003) (quoting *City of Canton v. Harris*, 489 U.S. 378, 389 (1989)).

Here, neither of Aldrich's two categories of training failures can pass summary judgment. Broadly, Aldrich points to two areas where CPD training is deficient: (1) training officers to respond in a measured way given a heightened emotional state, and (2) training officers how to not lie when filling out police reports. Aldrich points to no evidence to indicate that the City of Columbus failed to train its officers in either of these two areas. On the contrary, there is evidence in the record that the City of Columbus does train its police officers on the use-of-force continuum, the technique used here—the arm-bar takedown— and that the goal for any officer is to use the least amount of force necessary to achieve a satisfactory result. Aldrich presents no evidence that CPD fails to train its officers to not lie in their police reports or of the broader alleged method of overcharging criminal defendants to procure liability releases in exchange for plea agreements. Aldrich's claims fall woefully short of a genuine issue of material fact that should go to the jury.

13

Aldrich's best argument is this: if CPD trained its officers to use an arm-bar takedown in this type of situation, and that is unconstitutional, then CPD's training was unconstitutionally inadequate. Thus, the City of Columbus must have been deliberately indifferent to the rights of Columbus's residents. The best piece of evidence on this point is that the "arm bar take down" is on the buffet of force options at level one of CPD's force continuum. So, per CPD policy, the arm-bar takedown is one of the options within the next level of force after level zero, which includes officer presence, verbal and non-verbal commands, search and handcuffing. (Singleton Action-Response Report at 1, Doc. 16-5). To be sure, level zero didn't work here—Aldrich failed to comply with Officer Singleton's commands. But there is no evidence that CPD's use-of-force continuum *required* Officer Singleton (or any other officer) to perform an arm-bar takedown immediately after level zero use of force proves ineffective. Actions in the same general use-of-force category could result in materially different uses of force. As Officer Knox put it, the training provided by the City of Columbus taught him to respond to a suspect's level of resistance appropriately, working up the use-of-force continuum as the situation dictates. (Knox Dep. at 26:5–22). This is far from the deliberate indifference that Aldrich needs to show to survive summary judgment. Therefore, lacking any dispute of material fact on the issue of *Monell* liability, Defendants' motion for summary judgment is granted on Aldrich's claim against the City of Columbus.

### IV.     Conclusion

Defendants' motion for summary judgment is **GRANTED IN PART AND DENIED IN PART**. (Doc. 16). The Court grants Defendants summary judgment on Plaintiff's state law battery claim and Plaintiff's *Monell* claim. The Court denies Defendants summary judgment on Plaintiff's excessive-force claim.

IT IS SO ORDERED.

s/ James L. Graham
JAMES L. GRAHAM
United States District Judge

DATE: October 18, 2016

14